**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0738n.06

No. 10-2035

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | |
|---|---|
| ROBERT J. DIEBEL, | ) |
| | ) |
| Plaintiff–Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| L & H RESOURCES, LLC, | ) |
| | ) |
| Defendant–Appellee. | ) |
| | ) |

**FILED**

*Jul 10, 2012*

LEONARD GREEN, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEFORE:  BOGGS and GIBBONS, Circuit Judges; RUSSELL, District Judge[*]

**JULIA SMITH GIBBONS, Circuit Judge.** Plaintiff-Appellant Robert Diebel asserts that the district court erroneously awarded summary judgment in favor of his former employer, defendant-appellee L&H Resources (L&H), regarding Diebel's employment-discrimination claims under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634.  For the reasons that follow, we affirm the decision of the district court.

**I.**

Diebel, born in 1948, is a bricklayer with over forty years of experience.  He worked for defendant L&H for sixteen years.  By all accounts, Diebel was a competent bricklayer.  One of his

---

[*]The Honorable Thomas B. Russell, United States District Judge for the Western District of Kentucky, sitting by designation.

-1-

foremen, Mark LaFrance, stated that Diebel was "a very good bricklayer" and a hard worker. Other supervisors at L&H agreed that Diebel was a good bricklayer. In addition to brick, Diebel could also lay block. However, LaFrance explained that "[d]epending on th[e] particular job, we had to lay an astronomical amount of block per man, and that is not up [Diebel's] alleyway," because Diebel "could never lay a lot of block." He stated that Diebel "could [not] lay even close to" as many blocks as some of the company's high-performing block layers. Mark Buscher, a field superintendent, agreed that Diebel "was not one of the faster block layers."

The record reveals the following facts leading up to Diebel's departure from L&H. Diebel testified that he met with L&H's president, Michael Harman, in April of 2007 to discuss why he had been laid off.[1] According to Diebel, at the meeting Harman stated the following:

> [Harman] told me that he thought I had gotten too comfortable because I was there for so many years and that he didn't have room for that, that it was turning into a competitive business and he was building a younger company.
> . . .
> [Harman continued] that there was a lot of young bricklayers with other companies that he was going after . . . and that I should think about getting too comfortable with my position.
> . . .
> [Harman then] asked me when I was going to retire.

Harman admitted that he met with Diebel on numerous occasions, but denied that he ever mentioned creating a "younger company" or inquired about Diebel's plans for retirement.

---

[1]In the bricklaying business, it is common for workers to be laid off when they complete a project, but then be called back to work when there is another available project.

Diebel was subsequently called back to work and took a job in May 2007 in Toledo. He then took another job in Detroit—his last with L&H—which was called "ITC" and lasted from September until November, 2007. He was laid off in November 2007 toward the end of the ITC project and, although he called L&H to seek work in December and January, was not called back to work. In March 2008, at age 60, he took early retirement.

Diebel filed an ADEA discrimination charge with the Equal Employment Opportunity Commission, which issued a "right to sue letter." Diebel then filed a complaint in federal district court, alleging age-discrimination claims under the ADEA and Michigan's Elliot-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101. After discovery, L&H moved for summary judgment; Diebel opposed the motion. On February 17, 2010, the district court granted summary judgment in favor of L&H on both the ADEA and ELCRA claims. It found no direct or indirect evidence of age discrimination against Diebel.

The district court found that Harman's comments to Diebel in April 2007 about wanting to create a "younger company" did not constitute direct evidence of discrimination because there was no evidence that Harman played any role in the decision to lay off Diebel, and Diebel was re-hired for two additional jobs after the conversation took place. The district court concluded that Harman's general comments about the company "appear to be isolated remarks, unrelated to the staffing decisions made over a half-year later." The district court also found that Harman's questions about Diebel's plans for retirement had "virtually no temporal connection" with Diebel's layoff. Because the question about retirement was ambiguous and "not made in the context of a discussion about a

specific hiring decision," and because of Diebel's good relationship with L&H management, it was "far likelier" that questions about Diebel's long-term plans were more of a friendly inquiry than an attempt to suggest or compel retirement.

The district court also found insufficient indirect evidence of discrimination. The court noted that Diebel easily satisfied the first three elements of a *prima facie* case of indirect employment discrimination: he was over forty years old and therefore a member of a protected class; he was generally regarded as qualified; and he suffered an adverse employment action. However, Diebel could not show the fourth element of a *prima facie* case—that he was replaced by a person outside the protected class or was treated differently than a similarly situated non-protected employee.

The district court found that L&H was experiencing an overall decline in contract hours from November 2007 to March 2008 and was laying off bricklayers. Thus, the court found that workforce reduction was a factor in the decision to lay off Diebel and sought additional direct, circumstantial, or statistical evidence that L&H had singled out Diebel on account of his age. The court did not find such evidence in the record. Although Diebel showed that L&H *could* have recalled Diebel during the relevant time period (and indeed did recall some younger bricklayers), Diebel had provided no evidence that he had been singled out because of his age. Further, during the relevant time period, eighty bricklayers were laid off, over half of whom remained laid off longer than Diebel. Therefore, the district court found that Diebel failed to show the fourth element with evidence that he was replaced by a person outside the protected class. Finally, the district court also found that Diebel failed to establish the fourth element with evidence that he was treated differently than similarly

situated non-protected employees. The court noted that the four employees that were immediately transferred to other work sites from the ITC jobsite were not "similarly situated" because Diebel could not show that they had the same skill level as Diebel.

Even assuming Diebel had made a *prima facie* case, the district court found that L&H's proffered reasons for laying Diebel off—a general lack of work, Diebel's inefficiency at block-laying, and a belief that Diebel was planning to retire—were not a pretext for age discrimination. There was ample evidence that L&H was indeed experiencing an overall decrease in workload. Moreover, L&H clearly articulated its reason for not recalling Diebel immediately to a job on which LaFrance was the foreman (*i.e.*, his inefficiency at block laying) and its reason for not recalling Diebel generally (*i.e.*, the slowdown in work). In so finding, the court rejected the contention that L&H shifted its rationale for laying off Diebel.

Finding Diebel's ADEA claims without merit, the district court also found Diebel's ELCRA claims—analyzed under the same standard as ADEA claims—without merit. Diebel then filed this appeal.

## II.

Diebel brought his first claim pursuant to the ADEA. The ADEA "'was prompted by [a] concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes' that productivity and competence decline with age." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)). The law flatly "prohibits an employer from discharging an employee

'because of such individual's age.'" *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 (6th Cir. 2010) (quoting 29 U.S.C. § 623(a)(1)). The "ultimate question" is whether the employee was the victim of intentional age discrimination. *Id.* (internal quotation marks omitted).

To establish an ADEA claim, an employee must show either direct or indirect evidence of age discrimination. "Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Rowan*, 360 F.3d at 548. It is "evidence from the lips of the defendant proclaiming his or her . . . animus." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998) (internal quotation marks omitted). Alternatively, to show discrimination by means of indirect or circumstantial evidence, an employee must make out a *prima facie* case of discrimination under the *McDonnell Douglas* approach. An employee must show that (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position held; and (4) she was replaced by or treated less favorably than someone outside of the protected class. *See Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 317 (6th Cir. 2007). If an employee makes out a *prima facie* case, "the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action." *Schoonmaker*, 595 F.3d at 264. If the employer does so, the burden of production shifts back to the employee to show that the employer's stated reason was mere pretext. *Id.* During this time, however, the burden remains on the employee to show that age was the but-for cause of the adverse employment action. *Id.* (citing *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009)).

We review the district court's grant of summary judgment *de novo*. *Bishop v. Children's Ctr. for Developmental Enrichment*, 618 F.3d 533, 536 (6th Cir. 2010). In so doing, we view the factual evidence and draw all reasonable inferences in favor of Diebel as the nonmoving party at summary judgment. *See id.*

## A. Direct Evidence of Discrimination

Diebel claims that Harman's comments during his meeting with Diebel constituted direct evidence of age discrimination. He cites Harman's comments that he was trying to build a "younger company," that he was going after younger bricklayers, and that Diebel had gotten "too comfortable" because he had been with the company for "so many years" as evidence of direct discrimination. Diebel further argues that Harman's alleged inquiry into inquiry into his retirement plans show age discrimination.

In age-discrimination cases, allegedly discriminatory remarks are evaluated by considering four factors: "(1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination." *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 478 (6th Cir. 2002). No single factor is dispositive; they must be evaluated as a whole. *Id.*

Given Harman's position as president of the company and Diebel's testimony that Harman "makes all the decisions," there is evidence that Harman qualifies as a decisionmaker. Yet, there is

no indication that the statements related to the employment decision in question. Harman denies that he played any role whatsoever in the decision not to call Diebel back to work; he asserts that he did not even know that Diebel had been laid off. Indeed, apart from Diebel's assertion that Harman "makes all the decisions," all of the deposition testimony indicates that Butscher, the field superintendent, was ultimately in charge of deciding whether to call back an employee. Notably, Butscher stated that he never talked to Harman or anyone else about whether to bring Diebel back after November 2007, and Diebel has not provided any evidence to the contrary.

The next factor considers whether the statements are more than merely vague, ambiguous, or isolated. Harman's comments cannot be brushed aside as merely "friendly." *See, e.g.*, *Leonard v. Twin Towers*, 6 F. App'x 223, 230 (6th Cir. 2001) ("While it is true that an employer's 'friendly' inquiries about retirement cannot usually support a finding of age discrimination, we recognize that not all inquiries about retirement are 'friendly' and that repeated and unwelcome inquiries may certainly be relevant to a showing of age discrimination."). However, Harman never repeated this inquiry; he made one isolated query about Diebel's retirement plans.

Finally, we look to "the temporal connection between the statement and the challenged employment action." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 357 (6th Cir. 1998). Although the temporal connection is an important factor, "[s]ubstantial case law from this circuit cautions about the permissibility of drawing an inference of causation from temporal proximity alone." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010). The more

time that passes between the remark and the adverse action, all else equal, the weaker the claim. *See id.*

Harman's remarks occurred about seven months before Diebel was laid off. We have previously found discriminatory remarks made a few months before an adverse employment decision to be temporally proximate—but only where the employee presents strong evidence of one or more of the other factors above. *See Wharton v. Gorman-Rupp Co.*, 309 F. App'x 990, 992, 996 (6th Cir. 2009) (remarks made two months prior to adverse employment decision temporally proximate where speaker "witnessed all or most aspects of the hiring process" and had personal knowledge of hiring decisions). Not only is seven months longer than most cases in which this court has recognized temporal proximity, *see Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524 n.3 (6th Cir. 2008), but Diebel has not shown that Harman's remarks were related to the employment decision. Under these circumstances, the temporal connection is attenuated at best.

We acknowledge that Harman's remarks, if made, were indeed troubling. But considering all of these factors together, Diebel has failed to provide sufficient direct evidence of age discrimination to survive a motion for summary judgment.

## B. Indirect Evidence of Discrimination

Diebel also claims that he presented sufficient indirect evidence of age discrimination to survive a summary judgment motion. The district court found that he did not, and we agree.

### 1. *Prima Facie* Case

As outlined above, to make out a *prima facie* case, Diebel must show that (1) he was a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position held; and (4) he was replaced by someone outside of the protected class or similarly situated non-protected employees were treated more favorably.[2]  *See Tuttle*, 474 F.3d at 317. Because only the fourth factor is at issue here, the specific question is whether a similarly situated, "significantly younger person"—someone more than six years younger—was treated more favorably than Diebel.  *Grosjean v. First Energy Corp.*, 349 F.3d 332, 340 (6th Cir. 2003).  "The guiding principle" remains whether the evidence is "sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against [Diebel] because of age." *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1466 (6th Cir. 1990).

To show that similarly situated non-protected employees were treated more favorably or that he was singled out because of his age, Diebel argues that (1) other substantially younger workers

---

[2]The district court analyzed this matter as a workforce-reduction case, requiring Diebel to show, as part of his *prima facie* case, "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990).  In contrast to the district court, we apply the traditional *prima facie* test to Diebel's claim.  It is not clear that L&H ever argued before the district court that this matter should be treated as a workforce-reduction case.  And the nature of the bricklaying business, in which employees are laid off but often later called back to work, does not seem to fit well within the workforce-reduction framework. *See id.* (stating that a reduction in workforce occurs where "business considerations cause an employer to *eliminate* one or more positions within the company") (emphasis added).  Further, because the evidence before us only indicates the employment status of L&H employees during a narrow three- or four- month window, we are unable to determine whether, over a slightly longer period of time, there was any reduction in workforce at all.

generally were recalled when he was not; (2) three specific and substantially younger co-workers with whom Diebel was working on his last project were immediately reassigned when he was not; and (3) Harman's comments in the April 2007 meeting, even if not direct evidence of discrimination, provide adequate circumstantial evidence of discrimination. We find, contrary to the district court, that Diebel has made out a *prima facie* case on the basis of this evidence.

First, Diebel relies upon a chart that he prepared for the district court to demonstrate that other substantially younger workers were called back to work when he was not. The district court assumed that the chart revealed what Deibel asserted—that there were 32 jobs to which he could have been assigned, 22 of which were in Diebel's union jurisdiction, and that these jobs represented 178 instances in which a substantially younger employee was assigned. The district court, however, found these numbers unavailing because they only showed that Diebel *could* have been recalled, not that he was treated less favorably because of his age. The court noted, and Diebel does not contest, that 80 bricklayers were laid off during the relevant time period, 46 of whom remained laid off even longer than Diebel. Further, well over half of those 46 bricklayers were substantially younger than Diebel. On these grounds, the district court concluded that "layoff data combined with uncontroverted testimony from L&H employees regarding an overall lull in available work indicates that bricklayers of different ages were laid off from across the L&H workforce for as long as or longer than [Diebel]."

Against this conclusion, Diebel notes that, before the layoffs, 19% of L&H employees were in Diebel's age group and 81% were substantially younger. However, the layoffs disproportionately

afflicted those in Diebel's age group: 33% of the 46 bricklayers who were laid off for a longer period than Diebel were in his age group. Thus, those in Diebel's age group suffered 14% more layoffs than those in the substantially younger group—a fact that Diebel believes shows an effort to make the company younger.[3] And indeed, it appears that the district court overlooked Diebel's statistical argument, noting only (but accurately) that more than half of the 46 bricklayers laid off were substantially younger than Diebel. That employees in Diebel's age group were laid off in numbers 14% higher than their percentage of the labor pool does go towards establishing a *prima facie* case. Indeed, this court has found a *prima facie* case based *solely* on rudimentary statistics—even where those statistics include a smaller sample size than is present here or use a questionable methodology. *See Schuch v. Savair, Inc.*, 118 F. App'x 16, 22–23 (6th Cir. 2004) (finding a *prima facie* case on the basis of statistics even though they were "flawed" because they included sample sizes of thirteen, eleven and seven employees and did not control for employees who left voluntarily).

Second, Diebel argues that three substantially younger and similarly situated co-workers with whom he was working on his last project (ITC), were immediately reassigned when he was not. Diebel calls particular attention to fellow bricklayers Anthony Kubeck, Joel Woodward, and Chris Darke, all of whom are bricklayers who answer to the same boss and are covered by the same union agreement. The district court made short work of this claim, noting that Diebel, though an excellent

---

[3]Diebel forcefully rejects L&H's assertion that the percentage of workers in Diebel's age category, despite the layoffs, remained unchanged in 2007 and 2008. It appears that L&H's assertion is flawed insofar as it is based on an analysis of *all* individuals who remained on the L&H payroll even though some were laid off (including Diebel himself).

bricklayer, was not a particularly fast block layer. The court further assumed that Kubeck, Woodward and Darke were all immediately reassigned to Connor Creek Academy, a block job—and thus Diebel was not similarly situated to his three co-workers in terms of the skill level required for this job.

But as even L&H acknowledges, this assumption was erroneous: Kubeck, Woodward and Darke were all reassigned to other jobs *before* they were assigned to Connor Creek. And as Diebel notes, the jobs to which Kubeck, Woodward and Darke were immediately assigned included brick.[4] Although it appears that Kubeck and Woodward were laid off from ITC and were reassigned to brick projects before Diebel even finished at ITC, making their cases less comparable, Darke, though laid off from ITC a few weeks prior to Diebel, was reassigned to a project involving brick during the very period in which Diebel was laid off.[5] The fact that at least one of Diebel's substantially younger co-workers was reassigned to a job that involved brick after Diebel was laid off does lend support to an inference of age discrimination. Further, Darke is similarly situated insofar as he is a bricklayer who answers to the same ultimate boss and is covered by the same union agreement as Diebel—facts uncontested by L&H.

---

[4]Kubeck was assigned to Howell High School, a brick and block job. Woodward was assigned to Ashley Terrace, also a brick and block job.

[5]Whether Darke was assigned to a project involving brick, or strictly block, is disputed. Darke was reassigned to the Detroit Diesel Pilot Center in January of 2008. Although L&H contends that this was a block only project and cites Butscher's deposition testimony as support, L&H's own interrogatories state that the project involved both brick and block. Viewing the factual inferences in Diebel's favor, we assume that Drake was reassigned to a brick and block project in January 2008.

Finally, Harman's troubling comments about wanting to create a "younger company" and his inquiry about Diebel's retirement plans during the April 2007 meeting, even if not direct evidence of discrimination, are circumstantial evidence of age discrimination. Although these discriminatory comments cannot be considered direct evidence because they were not made by a decisionmaker, they may nonetheless be considered indirect or circumstantial evidence of discrimination. *See Coburn v. Rockwell Automation, Inc.*, 238 F. App'x 112, 120 (6th Cir. 2007).

In sum, contrary to the district court's understanding, at least one substantially younger worker (Darke) was immediately reassigned to a brick job during the period in which Diebel was laid off. Adding Harman's discriminatory comments and Diebel's statistical data to the evidentiary calculus, Diebel has made out a *prima facie* case of age discrimination.

## 2. Pretext

Because Diebel has put forth a *prima facie* case of age discrimination, we must consider whether the proffered reasons for L&H's adverse employment action were pretextual. L&H stated the following non-discriminatory rationales for not calling back Diebel: work had slowed down and Diebel could not lay block as quickly as his co-workers. To ultimately prevail in the case, Diebel must "prove by a preponderance of the evidence" that these two reasons were "in fact a pretext designed to mask illegal discrimination." *See Hein v. All Am. Plywood Co.*, 232 F.3d 482, 489 (6th Cir. 2000). He can do so by showing that "(1) the employer's stated reason for terminating the employee has no basis in fact, (2) the reason offered for terminating the employee was not the actual reason for the termination, or (3) the reason offered was insufficient to explain the employer's

action." *Spengler v. Worthington Cyclinders*, 615 F.3d 481, 493 (6th Cir. 2010) (internal quotation marks omitted). In considering evidence of pretext, we avoid formalistic approaches. Instead, "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009).

First, Diebel claims L&H did not actually lack work and therefore could have called him back. Although a lack-of-work justification is pretextual where the employer in fact increased hiring during the relevant time, *see Vincent v. Brewer Co.*, 514 F3.d 489, 498–99 (6th Cir. 2007), that is not the case here. It is uncontroverted that L&H was experiencing a slowdown in work during the three months when Diebel was laid off but had not yet retired. In December 2007, January 2008, and February 2008, the "work load for L&H employed bricklayers was reduced 14.2%, 9.2% and 39.7%, respectively." That some of L&H's bricklayers were working, apparently unaffected by the slowdown, does not mean that there was not in fact a slowdown. *See Bell v. Prefix, Inc.*, 321 F. App'x 423, 429 (6th Cir. 2009). Nor does it mean that the slowdown was "not the actual reason" for laying off Diebel. *See Spengler*, 615 F.3d at 493. Finding otherwise would risk imposing a policy whereby Diebel would be entitled to jump ahead of all other laid-off workers who are substantially younger, without regard to how long they had been laid off or the skills required for the job. The ADEA contemplates no such imposition.

Along similar lines, Diebel claims that one new union bricklayer, Dale Kosenko, was actually hired in November 2007, undercutting the asserted reason that there was a lack of work. Certainly, the hiring of a new bricklayer during the relevant time period could help demonstrate that L&H's "lack of work" rationale was a pretextual gloss. *See Ky. Gen., Inc. v. N.L.R.B.*, No. 97-6467, 178 F.3d 1294, 1999 WL 97249, at *6 (6th Cir. 1999) (table). But once again, that is not the case here. Kosenko was hired two weeks *before* Diebel was let go and nearly a month before December's lull in business. It is perfectly consistent for L&H to hire a new employee for a project and then assert, based on a period of time after that employee was hired, that there was a general slowdown in business.

Second, Diebel resorts to statistics to show pretext on the grounds that similarly situated younger employees were treated more favorably. Diebel argues that although those in his age group comprised 19% of L&H's bricklayers, that group suffered 33% of the layoffs that were for periods at least as long as his own. It is true that "[a]ppropriate statistical data showing an employer's pattern of conduct toward a protected class as a group can, if unrebutted, create an inference that a defendant discriminated against individual members of the class." *Barnes*, 896 F.2d at 1466. To create such an inference, however, "'the statistics must show a significant disparity and eliminate the most common nondiscriminatory explanations for the disparity.'" *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 622 (6th Cir. 2006) (quoting *Barnes*, 896 F.2d at 1466). We have cautioned that "courts must be careful to evaluate the proffered statistical analyses in light of the total circumstances present in a given case" because "[i]ncomplete or inapplicable analyses, simplistic

percentage comparisons, and small sample sizes produce statistical analyses with little probative value." *Shollenbarger v. Planes Moving & Storage*, 297 F. App'x 483, 485 (6th Cir. 2008). Even greater caution is warranted when general statistics are used to show that age caused the result in the case of one individual. *See* Tom Tinkham, *The Uses and Misuses of Statistical Proof in Age Discrimination Claims*, 27 Hofstra Lab. & Empl. L.J. 357, 362 (2010) ("In an individual case, a high level of statistical significance will not tell you whether age caused the result in that individual situation.").

Although these statistics may present a disparity, Diebel has made no effort to eliminate any of the several other possible explanations for the disparity. He has not ruled out random chance nor has he controlled for other variables, such as aligning the type of project with the skill set of the individual bricklayer.[6] Failure to control for random chance or employee abilities frequently undercuts statistical attempts to show pretext—and it does so here. *See Conner v. State Farm Mut. Auto. Ins. Co.*, 273 F. App'x 438, 442–43 (6th Cir. 2008); *Hilbert v. Ohio Dep't of Rehab.& Corr.*, 121 F. App'x 104, 110 (6th Cir. 2005).

Third, Diebel argues that L&H falsely claimed that he could not lay block as fast as his colleagues. There is no evidence that this reason is pretextual. Both Diebel's foreman as well as his field supervisor agreed that laying block was not Diebel's strength, especially if the project required

---

[6] It is uncontested, for example, that Diebel was sought out for his ability to do "fancy" brickwork, whereas other bricklayers were sought out for their ability to lay a high quantity of heavy block.

large amounts of block to be laid. Diebel's relative weakness in laying large quantities of block would at least explain why he was not immediately reassigned to block jobs.

Fourth, there is the matter of Harman's discriminatory comments about wanting to create a "younger company" and his question about Diebel's retirement. "This court has held that discriminatory remarks may serve as evidence of pretext because they indicate the presence of animus toward a protected group." *Vincent*, 514 F.3d at 498. "'If the comments were made by a person in a position to influence the alleged employment decision, they will be relevant unless they are so isolated and ambiguous as to be nonprobative.'" *Clack v. Rock-Tenn Co.*, 304 F. App'x 399, 405 (6th Cir. 2008) (quoting *Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 665 (6th Cir. 1999)). However, just because these comments buttressed Diebel's *prima facie* case does not necessarily mean they are sufficient to show pretext. *See Alfrey v. AK Steel Corp.*, 211 F. App'x 393, 396 n.3 (6th Cir. 2006) ("Evidence sufficient to establish a *prima facie* case is not necessarily sufficient to establish pretext.").

Harman's comments fail to show to pretext for the same reasons that they fail to show direct evidence of discrimination: Harman's remarks were isolated and there is little evidence that Harman was connected to the decision not to call back Diebel. *See Clack*, 304 F. App'x at 405 (manager's remarks, even though neither isolated nor ambiguous, did not evince pretext because there was "no indication on the record that [the manager] was included in discussions regarding the termination or had any kind of say in the ultimate decision"). When we have found pretext based on discriminatory comments, those comments have had much higher probative value than is present

here. *See Vincent*, 514 F.3d at 497–98 (finding pretext on the basis of "numerous," "degrading," and "particularly probative" comments, the majority of which were made by the supervisor who made the ultimate decision to terminate the employee).

The only evidence of pretext that has any real force is the fact that Darke was called back to a project involving brick during the period in which Diebel was laid off. This evidence is simply too thin to support a finding of pretext, especially in light of the weakness of Diebel's other evidence. As we have stated, "merely introducing a de minimis prima facie case and some slight evidence of pretext will not always, on its own, defeat judgment as a matter of law." *Butts v. McCullough*, 237 F. App'x 1, 8 (6th Cir. 2007).

### III.

Because the district court properly granted summary judgment in favor of L&H on Diebel's ADEA claim, it also properly granted summary judgment on Diebel's ELCRA claim, which is analyzed under the same standards. *See Geiger*, 579 F.3d at 626.

### IV.

For the foregoing reasons, we affirm the decision of the district court.